# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

### PITTSBURGH DIVISION

| | |
|---|---|
| JENNIFER MANN and ELENI KATZ, individually and on behalf of all others similarly situated, | ELECTRONICALLY FILED |
| | C.A. NO. _2:24-cv-114_____ |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BLUE DIAMOND GROWERS, | |
| Defendant. | |

### CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 18

PARTIES ......................................................................................................................... 19

CLASS DEFINITION AND ALLEGATIONS ................................................................. 22

CAUSES OF ACTION .................................................................................................... 25

    COUNT I ..................................................................................................................... 25
    VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, .. 25
    COUNT II .................................................................................................................... 29
    UNJUST ENRICHMENT ............................................................................................... 29

RELIEF DEMANDED ..................................................................................................... 30

JURY DEMAND ............................................................................................................. 31

Plaintiffs Jennifer Mann and Eleni Katz bring this action on behalf of themselves and all others similarly situated against Defendant Blue Diamond Growers. Plaintiffs make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## FACTUAL BACKGROUND

### A. Smoke Foods and Smoked Flavoring

1.      Smoking is a processing method to preserve or improve the flavor of food by exposing it to smoke from burning hardwoods.

2.      The drying action of the smoke and the different phenol compounds helps to preserve protein-rich foods such as meat and cheese.

3.      Hickory is the most common hardwood used in smoking because it imparts intense smoky, nutty, and sweet flavors.

4.      Pennsylvania was home to some of the nation's earliest smokehouses, defined by the Oxford English Dictionary as "a house or room used for curing meat, fish, etc., by means of smoke."

1

 

5.      The prevalence of smokehouses in the Pennsylvania countryside owes to the long history of German settlers and their "association with Pennsylvania Dutch foodways."[1]

6.      The result is that numerous companies like Seltzer's Smokehouse Meats, "Nestled in the gentle rolling hills of Pennsylvania Dutch country," call Pennsylvania their home.



---

[1]PENNSYLVANIA HISTORICAL & MUSEUM COMMISSION, *Outbuildings and Other Structures – Smokehouse,* https://www.phmc.pa.gov/Preservation/Field-Guide-for-Agricultural-Resources/Pages/Outbuildings-and-Structures-.aspx.

7.    Seltzer's and others "still…produce [their] products the old-fashioned way – in tall, wooden smokehouses over hand-tended fires," "where slow, steady billows of smoke penetrate" the foods they prepare.

8.    True to their name and production method, Seltzer's sells "Smokehouse Snackers," made in smokehouses.

 

9.    Another Pennsylvania firm, Penns Valley Meat Market, "cure[s] and smoke[s] [its products] the honest to goodness old fashion way on site in a traditional smokehouse," truthfully labeling them as "Smokehouse."



10.    Almonds are a type of food for which smoking is a simple process.

11.    The first step is creating a brine solution of partially dissolved salt in warm water.

12.    Second, the brine is applied to the almonds in metal trays.

13.    Finally, the trays are placed inside a smokehouse for several hours.

14.    After smoking, the salt visibly coats the almonds.

15.    Almonds made in this manner are sold to the public by companies like Nuts Aboutcha, with a picture of a smokehouse and billowing smoke in the background.

4



16.    Though a modern smokehouse may differ in certain respects, it still involves the movement of air which applies smoke and heat generated from burning hardwoods.



17.    During the second half of the twentieth century, the popularity of smoking foods over hardwoods decreased due to the prevalence of "smoke flavor,"

which is smoke condensed into a liquid form, known as liquid smoke or pyroligneous acid.[2]

18.    For numerous reasons, the past two decades have seen a resurgence in demand for foods smoked over hardwoods instead of using added smoke flavoring.

19.    First, consumers increasingly value foods made through traditional production methods.[3]

20.    According to researchers, "Cues signaling traditional production seem to affect liking in a positive direction, whereas signals of 'modernity' or 'industrialized food' seem to have a negative impact on liking."[4]

21.    Second, according to a recent survey of American consumers by the International Food Information Council ("IFIC"), almost thirty percent of the public consider additives in food one of their top three concerns.[5]

22.    Additives refer to non-food ingredients created in laboratories to fulfill various functions, such as facilitating processing ("processing aids"), improving

---

[2] Matthew Sedacca, *Liquid Smoke: The History Behind a Divisive Culinary Shortcut – Barbecue's love/hate relationship with the manufactured flavor*, EATER.COM (Jun 15, 2016), https://www.eater.com/2016/6/15/11945944/liquid-smoke-what-is-it.

[3] Del Giudice, Teresa, Carla Cavallo, and Riccardo Vecchio. "Credence attributes, consumers trust and sensory expectations in modern food market: is there a need to redefine their role?." INTERNATIONAL JOURNAL ON FOOD SYSTEM DYNAMICS 9.1012-2018-4128 (2018).

[4] Fernqvist, F. and Ekelund, L. (2014) *Credence and the effect on consumer liking of food – A review*. FOOD QUALITY AND PREFERENCE. Volume: 32, Part C, pp 340-353.

[5] Tom Neltner, *Chemicals in food continue to be a top food safety concern among consumers*, FOOD NAVIGATOR (Sept. 20, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/.

appearance ("colorants"), creating or enhancing taste ("flavorings") and extending shelf-life and slowing deterioration ("preservatives").

23.    Consumer aversion to additives is based on the belief that chemicals of any kind are not necessarily safe and may pose health risks.[6]

24.    According to one observer, "Our foods are laden with additives that are meant to enhance flavor, color and shelf life that research has shown are either bad for people to consume or inconclusively so."

25.    This factor is especially relevant since reports from the European Food Safety Authority ("EFSA") revealed that many liquid smoke flavorings contain compounds at levels which may pose a toxic risk when consumed.[7]

26.    Finally, pyroligneous acid lacks the balance of phenolic compounds, such as 2,3-Butanedione, 2,3-Pentanedione, 3-Butanoic acid, 3-Methylbutanoic acid, 4-Ethylguaiacol, 4-Propylguaiacol and/or 4-Vinylguaiacol, created from burning hardwoods.

**B. LEGAL BACKGROUND**

27.    Over 100 years ago, consumers were similarly concerned, based on the reports of muckraking journalists, about the harmful and untested chemicals added

---

[6] Cary Funk, *Public Perspectives on Food Risks*, PEW RESEARCH CENTER (Nov. 19, 2018), https://www.pewresearch.org/science/2018/11/19/public-perspectives-on-food-risks/.
[7] Faizah Ahmed, *Smoke-Flavored Foods May Be Toxic*, FOOD SAFETY NEWS, Feb. 16, 2010.

to their food to substitute for wholesome ingredients and natural production processes advertised.

28.    In response to this unregulated environment, the Pure Food and Drug Act of 1906 set standards for what companies were required to tell the public.

29.    This  requirement for disclosing added flavoring was strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938. 21 U.S.C. § 301 *et seq.*

30.    Pennsylvania adopted these laws and regulations through the Food Safety Act ("FSA"). 3 Pa. C.S. § 5721 *et seq.*; 3 Pa. C.S. § 5733(f).

31.    The newly established Food and Drug Administration ("FDA") was aware of how companies used advanced scientific knowledge to substitute dangerous and unhealthy flavoring chemicals in place of whole ingredients and natural production processes valued by the public.

32.    Beyond the potential to cause physical harm, these synthetic substances were significantly cheaper than the production processes they replaced.

33.    To facilitate an honest marketplace, the newly established Food and Drug Administration ("FDA") required the source of a food's taste, whether an ingredient, production process, or manufactured compounds intended to imitate them, be conspicuously disclosed. 21 C.F.R. § 101.22(i)(1).

34.    Since "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging," it made sense to require a food's "common or usual name" to indicate "the basic nature of the food or its characterizing properties or ingredients." 21 C.F.R. § 102.5(a).

35.     According to one scholar, this rule "is premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[8]

## C. THE LABELING IS MISLEADING

36.     To appeal to consumers seeking foods made through traditional processes without additives, Blue Diamond Growers sells "Smokehouse Almonds," across a red ribbon with glowing orange borders, above a fiery orange polygon, evocative of fire ("Product" or "Products").




---

[8] Steven Steinborn, Hogan & Hartson LLP, *Regulations: Making Taste Claims*, PreparedFoods.com, August 11, 2006.

9

37.    The labeling is false and misleading because despite the representations that the almonds were made in a smokehouse, their taste is provided entirely by liquid smoke flavoring.

38.    This is not disclosed on the front label or the fine print on the back in the ingredient list, where hurried consumers will not even think they need to look.

39.    Though the ingredients include "Natural Hickory Smoke Flavor," a form of pyroligneous acid or synthesized liquid smoke, this information does not tell consumers the almonds were not subject to any smoking over hardwoods.



**INGREDIENTS:**               ALMONDS, VEGETABLE OIL (CANOLA, SAFFLOWER AND/OR SUNFLOWER), SALT, CORN MALTODEXTRIN, NATURAL HICKORY SMOKE FLAVOR, YEAST, HYDROLYZED CORN AND SOY PROTEIN, NATURAL FLAVORS.

40.    In considering whether a food's label is misleading, it is required to consider not only representations made or suggested, but also the extent to which the labeling fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients in the food, which are of material interest to consumers.

10

41.    In describing the Product as "Smokehouse Almonds," they are represented as "hav[ing] [] characteristics…that [it] do[es] not have," which was getting their smoked taste from being smoked over hardwoods instead of from liquid smoke flavoring. Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") 73 P.S. § 201-2(4)(v).

42.    The Product is "misbranded," as describing the almonds' taste as deriving from a smokehouse "is false or misleading," because they were not subjected to any smoking over hardwoods. 21 U.S.C. § 343(a)(1); 3 Pa. C.S. § 5729(a)(1).

43.    The Product is "misbranded" and misleading because "Smokehouse Almonds" is not a truthful or non-misleading "common or usual name." 21 U.S.C. § 343(i); 3 Pa. C.S. § 5729(a)(7)(i).

44.    The name of "Smokehouse Almonds" is misleading because it does not disclose its "characterizing properties or ingredients," pyroligneous acid or synthesized liquid smoke, in place of being smoked over hardwoods. 21 C.F.R. § 102.5(a).

45.    This is because it fails to disclose the source of its smoked flavor, based on the use of liquid smoke instead of from being smoked. 21 C.F.R. § 101.22(i)(2).

11

46.    The FDA noted that "smoke ingredients are added flavors [and] should be declared in accordance with 21 C.F.R. § 101.22 [on the front of the label]."[9]

47.    Federal and state regulations require that because the Product's taste is described as from a "Smokehouse," yet uses pyroligneous acid or synthesized liquid smoke to provide its smoked taste, "Smokehouse" "may be immediately preceded by the word 'natural' and shall be immediately followed by the word 'flavored'…e.g., 'Natural [Smokehouse] Flavored [Almonds]," or "[Smokehouse] Flavored [Almonds].'" 21 C.F.R. § 101.22(i)(1)(i).

48.    Moreover, the FDA concluded that describing foods as "smoked" when "true smoke is absorbed in a liquid or other medium, and that medium is added to a food to provide a smoke flavor" was misleading to consumers.

49.    The name of "Smokehouse Almonds" is misleading because it is not "uniform among all identical or similar products." 21 C.F.R. § 102.5(a).

50.    These "identical or similar products" include competitor almonds from Planters, Walmart's Great Value, Aldi's Southern Grove, Target's Good & Gather, Safeway's Signature Select and Stop & Shop, which conspicuously disclose their

---

[9] FDA, Warning Letter to Smoked Seafood, Inc. dba Little Mermaid Smokehouse, MARCS-CMS 515739, June 27, 2017, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/smoked-seafood-inc-dba-little-mermaid-smokehouse-515739-06272017; FDA, Warning Letter to Walnut Creek Kitchens, Inc., CIN-15-436857-08, Nov. 27, 2014https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/walnut-creek-kitchens-inc-11172014.

smoked taste is not from being smoked over hardwood but from smoke flavoring, on the front label. 21 C.F.R. § 101.22(i)(1).

Smoked Almonds
Naturally Flavored

Natural Smoke Flavored Almonds With Other Natural Flavors




Hickory    Smoke    Flavored
Almonds



Hickory Smoked Flavored Almonds
With Other Natural Flavor



Hickory Smoked Almonds
Naturally Flavored



Smoked Almonds
Naturally Flavored



51.    The common or usual names of these products, "Smoked Almonds Naturally Flavored," "Natural Smoke Flavored Almonds With Other Natural Flavors," "Hickory Smoke Flavored Almonds," "Hickory Smoked Flavored Almonds With Other Natural Flavor," and "Hickory Smoked Almonds Naturally Flavored," tell purchasers that their smoked taste does not come from being smoked over hardwoods but from added smoke flavoring.

52.    The Product name of "Smokehouse Almonds" represents they are "of a particular standard, quality or grade," e.g., made through smoking over hardwoods, even though "they are of another," because they are not subjected to any smoking. 73 P.S. § 201-2(4)(vii).

### D. CONSUMERS OUTSIDE UNITED STATES TRUTHFULLY INFORMED OF ALMONDS' SMOKED TASTE

53.    Outside of the United States, the Product is truthfully described as having a "Smokehouse Flavour."





54.   In prior decades, the Smokehouse Almonds were truthfully described as "hickory smoke flavored."






**E.  CONCLUSION**

55.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately $3.19 for 12 oz pouches, $1.19 for 1.5 oz pouches, $9.99 for 40 oz pouches and $5.19 for 6 oz tins, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION AND VENUE

56.    This Court has personal jurisdiction over the Defendant. Defendant purposefully avails itself of the Pennsylvania consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the Commonwealth of Pennsylvania, where thousands of consumers purchase the Products every month.

57.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

58.    Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff Mann's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false, deceptive, and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within Allegheny County which is located in this District and the Defendant conducts business in this District.

## PARTIES

59.     Plaintiff Jennifer Mann is a citizen of Pennsylvania, residing in Allegheny County.

60.     Plaintiff Eleni Katz is a citizen of Pennsylvania, residing in Lehigh County.

61.     Defendant Blue Diamond Growers is a California agricultural cooperative with a principal place of business in California.

62.     Defendant produces consumer products that it markets and distributes to consumers and retail stores throughout the Commonwealth of Pennsylvania and within this District.

63.     Defendant is the largest cooperative of almond growers in the world.

64.     Defendant sells various kinds of almond products.

65.     The Product is sold in various sizes with uniform representations, whether sold in a can or small or large pouch.

66.     Plaintiffs are like most consumers and prefer foods without additives, based on the belief they are potentially harmful, not natural and unhealthy.

67.     Plaintiffs are like most consumers and look to the front label of foods to see what they are buying and to learn basic information about it.

68.     Plaintiffs are like most consumers and are accustomed to the front label of packaging telling them if what they are buying gets its taste from the ingredients or production processes highlighted there or added flavoring.

69. Plaintiffs are like most consumers and when they see that a front label does not disclose added flavoring, they expect a food's taste to come from the highlighted ingredients or production process.

70. Plaintiffs are like most consumers and when they see a label that describes a food with the term, "Smokehouse," they expect its smoked taste to be from smoking over hardwoods.

71. Plaintiffs are like most consumers who like foods that are smoked, which get their smoked taste from being smoked over hardwoods.

72. Plaintiffs read, saw and relied on the statement of "Smokehouse Almonds," across a red ribbon with glowing orange borders, above a fiery orange polygon, evocative of fire, to expect the Product's taste was from being smoked over hardwoods.

73. Plaintiffs relied on the omission of any added flavoring from the front label as it related to the taste of the Product's smoked taste.

74. Plaintiffs relied on the statement of "Smokehouse" as it related to the Product's taste.

75. Plaintiffs did not expect that instead of being subjected to any smoking, the Product would use added liquid smoke or pyroligneous acid to provide its entire smoked taste.

76. Plaintiff Mann purchased the Blue Diamond Smokehouse Almonds with the statement, "Smokehouse," across a red ribbon with glowing orange borders, above a fiery orange polygon, evocative of fire, in one or more formats, such as cans

20

or pouches, at stores in Allegheny County of the type where such products are sold,
such as grocery stores, convenience stores, big box stores, warehouse club stores,
gas stations, truck stops and/or other locations, between December 2020 and
December 2023.

77.    Plaintiff Katz purchased the Blue Diamond Smokehouse Almonds with
the statement, "Smokehouse," across a red ribbon with glowing orange borders,
above a fiery orange polygon, evocative of fire, in one or more formats, such as cans
or pouches, at stores in Lehigh County of the type where such products are sold,
such as grocery stores, convenience stores, big box stores, warehouse club stores,
gas stations, truck stops and/or other locations, between December 2020 and
December 2023.

78.    Plaintiffs bought the Product at or exceeding the above-referenced
price.

79.    Plaintiffs paid more for the Product than they would have had they
known its taste was not from being smoked over hardwoods but from liquid smoke
or pyroligneous acid to provide its entire smoked taste, as they would have paid
less.

80.    The Product was worth less than what Plaintiffs paid, and they would
not have paid as much absent Defendant's false and misleading statements and
omissions.

81.    Plaintiffs reserve the right to amend this Complaint to add different or
additional defendants, including without limitation any officer, director, employee,

supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

82. Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## **CLASS DEFINITION AND ALLEGATIONS**

83. Plaintiffs, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), brings this action on behalf of the following class (the "Class"):

> All persons who purchased Defendant's Products within the Commonwealth of Pennsylvania and within the applicable statute of limitations period.

84. Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom the case is assigned and any immediate family members thereof.

85. The members of the Class are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.

86. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of

the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

    a.  whether Defendant misrepresented material facts concerning the Products on the label of every product;

    b.  whether Defendant misrepresented material facts concerning the Products in print and digital marketing of every product;

    c.  whether Defendant's conduct was unfair and/or deceptive;

    d.  whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

    e.  whether Defendant breached express warranties to Plaintiffs and the Class;

    f.  whether Plaintiffs and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

87.    Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like all members of the Class, purchased Defendant's Products bearing the smokehouse representations and Plaintiffs sustained damages from Defendant's wrongful conduct.

88.    Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel that is experienced in litigating complex class actions. Plaintiffs have no interests which conflict with those of the Class.

89.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

90.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate equitable relief with respect to the Class as a whole.

91.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of

conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### Violation of The Pennsylvania Unfair Trade Practices and Consumer Protection Law,
### 73 Pa. Cons. Stat. §§ 201-1 *et seq.*

92.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.     Plaintiffs bring this Count individually and on behalf of the members of the Class.

94.     Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 *et seq.* (the "UTPCPL") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

95.     The UTPCPL specifically defines what constitutes unfair methods of competition and unfair or deceptive acts or practices. Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following:

(a) representing that its goods and services have characteristics, uses, benefits, and qualities they do not have (73 Pa. Cons. Stat. § 201-2(4)(v));

25

(b) representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(v)(vii));

(c) advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)); and

(d) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 Pa. Cons. Stat. § 201-2(v)(xxi)).

96.    Defendant is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

97.    Plaintiffs and Class Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

98.    Defendant knew or should have known that when the Products left its control, that they were not in conformity or consistent with representations on the packaging. Accordingly, Defendant's Products did not provide the represented and warranted benefits.

99.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

100.    Defendant intended that Plaintiffs and other Class Members rely on its omissions and misrepresentations, and this reliance was crucial to Defendant commanding a premium price for the Products.

101.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiffs and the Class have suffered and will continue to suffer injury,

26

ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

102.    Defendant deceived and continues to deceive consumers about the Products. This conduct constitutes unfair or deceptive acts or practices within the meaning of the UTPCPL. This illegal conduct by Defendant is continuing, with no indication that it will cease.

103.    Accordingly, Defendant's deceptive and misleading statements deceived Plaintiff and Class Members and a substantial segment of the target consumer audience and improperly influenced consumers' purchasing decisions, as Plaintiff and Class Members relied on such misrepresentations in violation of the UTPCPL.

104.    Defendant represented that the Product had characteristics it did not have, which was being smoked in a smokehouse and/or subject to smoking over hardwoods. 73 P.S. § 201-2(4)(v).

105.    Defendant represented the Product, through its name of "Smokehouse Almonds," was "of a particular standard, quality or grade," e.g., made through smoking over hardwoods, even though "[it was] of another," because it was not subjected to any smoking. 73 P.S. § 201-2(4)(vii).

106.    Defendant engaged in fraudulent and/or deceptive conduct which created the likelihood of confusion or of misunderstanding by consumers as to the source of the Product's smoked taste. 73 P.S. § 201-2(4)(xxi).

107.    Defendant failed to state a material fact, which was the addition of added smoke flavoring on the front label, and the failure to do so deceived or tends to deceive consumers.

108.    Plaintiffs believed the Product's smoked taste was from being smoked in a smokehouse and/or from being smoked over hardwoods.

109.    Plaintiffs read and relied on the label which said "Smokehouse" and the glowing red and orange labeling, without any qualifying terms, which caused them to believe they were buying a smoked product.

110.    Plaintiffs were familiar with how foods with added flavoring would disclose this fact on their front label and because the Product omitted such a disclosure, it told them its taste was not from added flavoring, but from being prepared in a smokehouse.

111.    Plaintiffs paid more for the Product and would not have paid as much if they knew that instead of being smoked over hardwoods, its taste was from liquid smoke or pyroligneous acid.

112.    Plaintiffs seek to recover for economic injury and/or loss they sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the UTPCPL, by paying more for it than they otherwise would have.

113.    Plaintiffs will produce evidence showing how they and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's

representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

114.    Plaintiffs and the Class seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

## COUNT II
## Unjust Enrichment

115.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against the Defendant.

117.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiffs and the Class.

118.    Plaintiffs and Class Members conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive Product labels.

119.    Defendant accepted or retained the nongratuitous benefits conferred by Plaintiffs and Class Members, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiffs and Class Members were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

120.    At the time of Plaintiffs and Class Members' purchases, Defendant knew of the truth about the Products and consumers' interpretation of the packaging. Knowing that its representations were false, Defendant sold the Products to Plaintiffs and Class Members at a premium price. Accordingly, Defendant continues to retain a benefit improperly obtained to the detriment of Plaintiffs and Class Members.

121.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts had been known.

122.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and Class Members for their unjust enrichment, as ordered by the Court.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class

and Plaintiffs' attorneys as Class Counsel to represent the members of the Class;

b.  For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.  For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiffs and the Class for all causes of action;

d.  For prejudgment and postjudgment interest on all amounts awarded;

e.  For an order awarding punitive damages;

f.  For an order awarding attorneys' fees and expenses and costs of suit; and

g.  Granting such other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: January 28, 2024

Respectfully submitted,

/s/ Steffan T. Keeton
Steffan T. Keeton, Esq.
stkeeton@keetonfirm.com
Pa. Id. No. 314635

**THE KEETON FIRM LLC**
100 S Commons, Ste. 102
Pittsburgh, PA 15212
1-888-412-5291

*Counsel for Plaintiffs and the Class*

31